# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| NATIONAL FIRE & MARINE INSURANCE COMPANY, | )<br>)<br>) |
| Plaintiff, | ) |
| v. | ) C.A. No. _____ |
| PACCAR INC., | )<br>) **JURY TRIAL DEMANDED** |
| Defendant. | )<br>)<br>) |

## COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff National Fire & Marine Insurance Company ("NFM"), for its Complaint against Defendant PACCAR Inc. ("PACCAR"), asserts as follows:

### NATURE OF THE ACTION

1. This action will determine the parties' respective rights and obligations under three excess insurance policies that NFM issued to PACCAR between June 2016 and June 2019 (the "Policies") for thousands of written demands that PACCAR has received from claimants and third parties accusing PACCAR and certain of its subsidiaries of colluding with other manufacturers of medium and heavy duty commercial trucks to fix prices in violation of European Union ("EU") antitrust laws.

2. Specifically, this action seeks a judicial declaration that the Policies do not cover PACCAR or any other Insured for thousands of demand letters and third-party notice letters that PACCAR received since 2016—following a decision from the European Commission ("EC") fining PACCAR and other truck manufacturers for participating in an illegal price-fixing cartel lasting fourteen years and documenting PACCAR's unequivocal admission to having participated in the truck-pricing cartel.

3. PACCAR has tendered to NFM for coverage almost 3000 demand letters from parties claiming they overpaid for the trucks they purchased, rented or lease-financed because of illegal price fixing by PACCAR and its co-cartelists from 1997 to 2011, and over 500 third-party notice letters from co-cartelists facing similar liability for violating EU antitrust laws and asserting that PACCAR should share financial responsibility for those losses (collectively, the "Claims"); however, the Claims are not covered by any of the Policies.

4. As detailed below, the Policies would cover the Claims at issue here only if the Claims met the specific definitions of "Advertising Injury," "Personal Injury" and/or "Property Damage" in the Polices. Here, the underlying claimants' demands for repayment of overcharges arising from an illegal price-fixing conspiracy do not trigger coverage under the clear wording of those provisions.

5. Further, matters otherwise meeting those triggering provisions (which the Claims do not) also must arise from an event that is "neither expected nor intended from the standpoint of the insured" to be covered. But the Claims manifestly fail that test as well. Claims for financial loss by victims of an admitted illegal price-fixing cartel are the polar opposite from something arising from an unexpected and unintended event. The very purpose of a price-fixing cartel is to make customers pay artificially inflated prices above competitive levels. The result of price fixing is both expected and intended—and hence not covered under the Policies.

6. Accordingly, NFM seeks a declaratory judgment that it has no obligation to PACCAR under the Policies to pay either indemnity or defense costs for the subject Claims.

**PARTIES**

7. Plaintiff National Fire & Marine Insurance Company is a Nebraska corporation with its principal place of business at 1314 Douglas Street, Suite 1400, Omaha, Nebraska 68102.

8. PACCAR Inc. is a Delaware corporation with its principal place of business at 777 106th Ave NE, Bellevue, Washington 98004.

9. PACCAR may be served through its registered agent Prentice-Hall Corporation System, Inc., 251 Little Falls Drive, Wilmington, Delaware 19808.

10. PACCAR's DAF unit manufactures and sells medium and heavy-duty commercial vehicles in Europe through several foreign subsidiaries including DAF Trucks N.V. and DAF Trucks Deutschland GmbH (collectively "DAF").

## JURISDICTION AND VENUE

11. This is an action for declaratory judgment pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, and Rule 57 of the Federal Rules of Civil Procedure for the purposes of determining a question of actual controversy between the parties as described more fully below.

12. This action currently is ripe for adjudication.

13. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332. Complete diversity of citizenship exists between the parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

14. Venue is proper in this Court pursuant to 28 U.S.C. § 1391. PACCAR is incorporated in Delaware, and the parties have specified Delaware as the exclusive venue for litigating certain disputes, like those pled here, arising under the Policies.

## FACTUAL BACKGROUND

### A. The Price-Fixing Conspiracy In Europe's Commercial Trucking Industry

15. In 2010, European competition authorities received a tip from truck manufacturer MAN SE (now part of the Volkswagen Group) that numerous European commercial truck manufacturers were participating in an illegal price-fixing cartel in violation of EU antitrust laws.

16. In January 2011, European Commission ("EC") officials raided the offices of various European truck manufacturers, including PACCAR/DAF, as part of its investigation into possible antitrust violations in the EU's commercial trucking industry.

17. In November 2014, the EC informed a number of heavy and medium duty truck manufacturers, including PACCAR/DAF, that the EC suspected they had been violating EU antitrust laws by participating in an illegal cartel.

18. In April 2016, PACCAR recorded a nearly $1 billion charge on its earning statement in anticipation of paying a significant fine to the EC.

19. In July 2016, the EC imposed a record-setting total fine of € 2.926 billion (around US $3.3 billion) on various truck companies, including Volvo/Renault, Daimler, Iveco and PACCAR/DAF, for participating in an illegal fourteen-year conspiracy to fix commercial truck prices and pass on to customers the costs of complying with stricter emission rules.

20. The EC fined PACCAR and DAF €752.7 million (US $833.0 million) for their participation in the illegal truck pricing cartel.

21. The EC investigation revealed that MAN, Volvo/Renault, Daimler, Iveco, DAF and at least one other company had engaged in an illegal cartel in which they conspired with each other regarding:

- **coordinating prices at "gross list" level** for medium and heavy trucks in the European Economic Area ("EEA"). The "gross list" price level relates to the factory price of trucks, as set by each manufacturer. Generally, these gross list prices are the basis for pricing in the trucks industry. The final price paid by buyers is then based on further adjustments, done at national and local level, to these gross list prices.

- **the timing for the introduction of emission technologies** for medium and heavy trucks to comply with the increasingly strict European emissions standards.

- **the passing on to customers of the costs for the emissions technologies** required to comply with European emissions standards.

22. PACCAR/DAF received a 10% reduction in their fine because they admitted liability to the EC in "clear and unequivocal terms" for participating in the illegal price-fixing cartel described in the EC's written decision of 19 July 2016 (the "Decision"). *See* http://ec.europa.eu/competition/antitrust/cases/dec_docs/39824/39824_6567_14.pdf

23. PACCAR and DAF paid the fine to the EC in August 2016.

**B.   The Claims At Issue In This Dispute**

24. PACCAR has received thousands of demand letters from truck purchasers and third parties arising from the EC's Decision and PACCAR/DAF's admitted liability for infringing EU antitrust laws.

25. In each of the Claims, on information and belief, the claimants are seeking to recover the amount (allegedly) overpaid for medium and heavy duty trucks because of PACCAR's participation in the illegal truck pricing cartel.

26. On July 16, 2019, PACCAR wrote to NFM forwarding the Claims and asserting "a formal demand that [NFM] defend PACCAR or pay its defense costs in full and indemnify PACCAR in full" under the Policies.

**C.   The Policies**

27. PACCAR has tendered the Claims to NFM under three excess insurance policies:

- Policy No. 640515 issued for the claims-made policy period from 20 June 2016 to 20 June 2017 (the "2016 Policy").

- Policy No. 92SRD307070/661347 issued for the claims-made policy period from 20 June 2017 to 20 June 2018 (the "2017 Policy").

- Policy No. 92SRD307088/749630 issued for the claims-made policy period from 20 June 2018 to 20 June 2019 (the "2018 Policy")

28. The 2016 Policy, 2017 Policy and 2018 Policy are referred to collectively as the Policies.

29. The Policies are materially similar in all respects relevant to this lawsuit.

30. "PERSONS INSURED" under the Policies includes PACCAR as the Named Insured and any subsidiary.

31. Under the Policies' Insuring Agreement, NFM agrees to pay "Ultimate Net Loss" on behalf of the Insured in excess of certain "Retained Amounts," which the Insured shall become legally obligated to pay as damages because of "Personal Injury," "Property Damage" or "Advertising Injury" caused by an "Occurrence" to which this insurance applies, due to:

   (a) liability imposed upon the Insured by law; or

   (b) liability assumed by the Insured under contract as defined and/or restricted in this Policy.

32. Furthermore, the Policies' Insuring Agreement (as amended by endorsement) states that the insurance applies to Personal Injury, Property Damage or Advertising Injury only if a Claim for such damages:

   (a) is first made in writing against the Insured during the policy period, AND

   (b) is attributable to an Occurrence which occurred on or after the Retroactive Date shown [i.e., 20 June 1986 as relevant here].

33. As noted, the Policies are excess policies. The Insured must pay the "Retained Amounts" for indemnity before NFM has any obligation to pay Ultimate Net Loss. Furthermore, the Named Insured (PACCAR) shall bear all legal costs and expenses incurred, including for

defense, until such time as the Retained Amounts are exhausted by indemnity payments. The Retained Amounts shall not be impaired by any Claims brought against the Insured for coverages which are not included in the terms and conditions of this Policy.

34. "ULTIMATE NET LOSS" as defined in the Policies means the total sum which the Insured, or any Underwriter or company as its insurer, or both become obligated to pay by reason of Personal Injury, Property Damage or Advertising Injury Claims, either through adjudication or compromise, and shall also include hospital, medical and funeral charges, and all sums paid or payable as salaries, wages, compensation, fees, charges, interest, or expenses for doctors, nurses, and investigators and other persons, and for settlement, adjustment, investigation and defense of Claims and excluding only the Insured's salaries.

35. "CLAIM" under the Policies is a defined term meaning a written demand upon the Insured for damages or services and shall include the service of suit or institution of arbitration proceedings against the Insured. Claim does not include reports of accidents, acts, errors, Occurrences, offenses or omissions which may give rise to a Claim under this Policy.

36. The Policies each define "ADVERTISING INJURY" as injury arising out of one or more of the following offenses:

   i. oral and written publication of material that **slanders or libels** a person or organisation or disparages a person's or organisation's goods, products or services;

   ii. oral or written publication of material that violates a person's **right of privacy**;

   iii. misappropriation of **advertising ideas** or style of doing business; or

   iv. **infringement** of copyright, title or slogan. [emphasis added]

37. The Policies each define "PERSONAL INJURY" as:

   i. **bodily injury**, sickness or disease sustained by a person including mental anguish, mental injury or death resulting therefrom;

      ii. **false arrest**, false imprisonment, wrongful detention, or malicious prosecution;

      iii. **wrongful entry** into, or eviction of any person from a room, dwelling, or premises that the person occupies;

      iv. oral or written publication of material that **slanders or libels** a person or organisation or disparages a person's or organisation's goods, products or services; or

      v. oral or written publication of material that violates a person's **right of privacy**,

except that 2, 3, 4, 5 do not apply to advertising, publishing, broadcasting or telecasting done by or for the Insured. [emphasis added]

38.    The Policies each define "PROPERTY DAMAGE" as:

      vi. **physical injury** to or destruction of tangible property, including loss of use thereof at any time resulting therefrom; or

      vii. loss of use of **tangible property which has not been physically injured** or destroyed provided such loss of use is caused by a covered Occurrence. [emphasis added]

39.    With respect to Personal Injury and Property Damage, the term "OCCURRENCE" means an event, including continuous or repeated exposures to conditions, which result in Personal Injury and Property Damage, *neither expected nor intended from the standpoint of the Insured*. All such exposure to substantially the same general conditions shall be deemed one Occurrence.

40.    In addition, the Policies expressly exclude coverage for any liability resulting from Personal Injury or Property Damage which is *expected or intended by the Insured* (with an exception plainly not relevant here).

41.    With respect to Advertising Injury, all damages involving the same injurious material or act, regardless of the frequency or repetition thereof, the number and kind of media used, and the number of claimants shall be deemed to arise out of one Occurrence.

42. The Policies obligate the Insured to give NFM prompt written notice of any Occurrence which reasonably may be expected to result in a Claim and which may be expected to involve the Policy, including (1) how, when and where the Occurrence took place, and (2) the names and addresses of injured persons and witnesses.

43. With respect to Claims, the Insured must give NFM prompt written notice of any Claim which may reasonably be expected to involve a given policy and must give NFM prompt notice whenever the Insured has information from which the Insured could reasonably conclude that a Claim or potential Claim, alone or in combination with other Claims or potential Claims, may deplete the Retained amounts by $1,000,000 or more.

44. Furthermore, under the Policies, the Insureds shall not except at their own cost, voluntarily make a payment, assume any obligation or incur any expense (other than for first aid) without NFM's consent.

45. Each of the Policies includes an express condition limiting NFM's liability where, if any loss is also covered in whole or in part under any other excess policy issued to the Insured prior to the inception date, NFM's limit of liability shall be reduced by any amounts due the Insured on account of any such prior insurance.

46. Even though no amount is currently owed, or has been claimed to be currently due, under the Policies, the parties must promptly assess the applicability or lack of coverage requested in PACCAR's July 19, 2019 letter and conduct themselves accordingly. In these circumstances, NFM seeks a declaratory judgment confirming the rights of parties' respective rights and obligations in connection with the subject Claims.

## REQUEST FOR DECLARATORY JUDGMENT

**NFM Seeks A Judicial Declaration That It Has No Duty to Pay Ultimate Net Loss Under the Policies for the Claims Against PACCAR**

47. NFM re-alleges and incorporates by reference all preceding paragraphs of this Counterclaim as if fully set forth herein.

48. The Policies do not provide coverage for the subject Claims against PACCAR.

49. PACCAR has not complied with all conditions precedent to coverage under the Policies including but not limited with respect to notice of Occurrence and notice of Claims.

50. The Claims do not allege an "Occurrence" as defined in the Policies.

51. The Claims do not allege "Advertising Injury" as defined in the Policies.

52. The Claims do not allege "Property Damage" as defined in the Policies.

53. The Claims do not allege "Personal Injury" as defined in the Policies.

54. The Policies exclude coverage for the Claims to the extent they arise from Personal Injury or Property Damage (if any) which is expected or intended by the Insured.

55. NFM is not liable in connection with the Claims to the extent PACCAR has assumed liability, made any voluntary payments or incurred any expense without NFM's consent.

56. Additionally, and regardless, public policy precludes PACCAR from recovering insurance proceeds for any loss it may sustain for reimbursing victims who assert they were overcharged as a result of PACCAR and its subsidiaries' admitted participation in an illegal price-fixing cartel.

57. Therefore, NFM is entitled to a judgment declaring that the Policies do not cover the Claims and further that NFM has no obligation under the Polices to pay any defense costs or indemnity to or on behalf of PACCAR or its subsidiaries for the Claims.

## PRAYER FOR RELIEF

**WHEREFORE**, NFM respectfully requests that this Court enter judgment in NFM's favor as follows:

A. Declaring that the 2016 Policy does not provide coverage for any of the Claims.

B. Declaring that the 2017 Policy does not provide coverage for any of the Claims

C. Declaring that the 2018 Policy does not provide coverage for any of the Claims.

D. Awarding NFM the costs of this action; and

E. Award NFM such other and further relief as the Court may deem just and proper.

## JURY DEMAND

NFM requests a jury for all issues "so triable"; however, in so doing, NFM clarifies that, under the express wording of the Policies, undisputed and indisputable facts, and applicable law, NFM is entitled to the declaratory judgment it seeks as a matter of law.


Dated: August 13, 2019                                  Respectfully submitted,


Of Counsel:                                             SMITH, KATZENSTEIN & JENKINS LLP

John R. Gerstein                                        */s/ Robert J. Katzenstein*
Gabriela Richeimer                                      Robert J. Katzenstein (No. 378)
CLYDE & CO US LLP                                       Eve H. Ormerod (No. 5369)
1775 Pennsylvania Avenue, NW, 4th Floor                 Brandywine Building
Washington, DC 20006                                    1000 West Street, Suite 1501
202-747-5100                                            P.O. Box 410
jack.gerstein@clydeco.us                                Wilmington, DE 19899
gaby.richeimer@clydeco.us                               302-652-8400
                                                        rjk@skjlaw.com
                                                        eho@skjlaw.com

                                                        Counsel for Plaintiff
                                                        National Fire & Marine Insurance Company